UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SHAILLY BARNES, *et al.*<br><br>Defendants. | Criminal Action No. 18-mj-54<br><br>Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Defendant-appellants Shailly Barnes, Rosalyn Woodward Pelles, and Elizabeth Theoharis, appeal the $100 fines and time-served sentences they each received upon pleading guilty to violating 40 U.S.C. § 6135. Notice of Appeal by Shailly Barnes and Rosalyn Woodward Pelles, ECF No. 185; Notice of Appeal by Elizabeth Theoharis, ECF No. 186. That statute makes it unlawful to "parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds, or to display in the Building and grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement." 40 U.S.C. § 6135. They contend that the Magistrate Judge who accepted those pleas erred by refusing to dismiss the charge against them as a violation of their First Amendment rights. Appeal from the United States Dist. Court for the Dist. of Columbia Magistrate Decision Denying Defendants' Joint Mot. to Dismiss ("Defs.' Br.") at 3, ECF No. 203. Finding no such error, the defendants' judgments of conviction and sentences are affirmed.

I.  BACKGROUND

On June 11, 2018, defendants participated in a demonstration that had made its way to the street in front of the United States Supreme Court. Gov't Opp'n to the Appeal of the U.S. Magistrate's Decision Denying the Appellants' Joint Mot. to Dismiss ("Gov't Br.") at 1, ECF

1

No. 204.  According to defendants, the demonstration was associated with the "Poor People's Campaign: A National Call for Moral Revival," an organization they say is "continu[ing] . . . the economic justice advocacy that was central to Reverend Martin Luther King's work."  Defs.' Joint Mot. to Dismiss ("Defs.' Mot. to Dismiss") at 2, ECF No. 108.  In response United States Capitol Police ("USCP") closed the street to vehicles and attempted to clear the area.  Gov't Br. at 1.  USCP officers issued warnings to the demonstrators in the street and eventually made several arrests.  *Id*.

Although USCP officers successfully cleared the street, they did not end the demonstration.  *Id*.  While over a hundred people stood on the sidewalk, the three defendants party to this appeal and six other individuals climbed the steps onto the plaza in front of the Supreme Court.  *Id*.  Defendant Theoharis carried a megaphone with her, gave a speech, and passed the megaphone to others.  *Id*.  As the megaphone was passed around, defendants and their six fellow demonstrators joined hands and bowed their heads in prayer.  Defs.' Mot. to Dismiss at 1.  Their prayer "address[ed] voter suppression, economic inequality, and persistent poverty in the United States."  Defs.' Br. at 1.  They each wore various items of clothing indicating their association with the Poor People's Campaign.  Gov't Br. at 1.

United States Supreme Court Police Department ("USSCPD") Chief Jeff Smith, using a megaphone of his own, issued a warning to the nine demonstrators that failure to vacate the Supreme Court plaza would result in their arrest.  *Id*. at 2.  The demonstrators did not move.  Four minutes later, Smith issued another warning.  *Id*.  Again, defendants and their associates stood pat.  *Id.*  Following a final warning, USSCPD began arresting defendants and the six others.  *Id*.

Defendants remained in detention until the following day, when all nine of the demonstrators who had been praying on the Supreme Court plaza were charged in a single criminal information with one count of "unlawfully parad[ing], stand[ing], or mov[ing] in processions or assemblages on the Supreme Court Grounds, or display[ing] on the Grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement" in violation of 40 U.S.C. § 6135. Information at 1–2, ECF No. 1. They made their initial appearances that day and were all released on personal recognizance, pending trial. Min. Entry (June 12, 2018).

Over the next year and a half, the nine defendants and the government contested what that trial would look like, and, for that matter, whether there should be a trial at all. On August 10, 2018, eight of the nine defendants moved for a jury trial, which the government opposed. Defs.' Mot. for Jury Trial at 1, ECF No. 61; Gov't Omnibus Opp'n to Defs.' Mot. for Jury Trial at 1, ECF No. 75. Holding that "Congress clearly intended that Defendants' charge be considered a petty offense" not subject to the Sixth Amendment's jury trial guarantee, the Magistrate Judge denied that motion on May 3, 2019. Mem. Opinion & Order (May 3, 2019), ECF No. 133. As the motion for a Jury trial was pending, on February 14, 2018, all nine defendants moved to dismiss the charge against them, arguing that "as applied to their conduct and on its face, the statute under which they are being prosecuted, 40 U.S.C. § 6135, violates the First Amendment of the United States Constitution." Defs.' Mot. to Dismiss at 1. The next day, a single defendant, Jimmie Hawkins, moved to dismiss the information for an alternative reason, namely that he was being "selectively prosecut[ed] . . . based on impermissible grounds." Hawkins' Mot. to Dismiss at 1, ECF No. 109. Both motions were denied on October 24, 2019,

3

four days before trial was scheduled to commence.  *See* Mem. Opinion & Order (Oct. 24, 2019), ECF No. 164.

Their bench trial scheduled to begin on October 28, 2019, never occurred.  That day, six of the nine defendants entered into deferred prosecution agreements with the government, by which they admitted that their conduct violated 40 U.S.C. § 6135 and agreed, *inter alia*, to "[s]tay away from the United States Supreme Court building and grounds, including the plaza." *See, e.g.*, Jimmie Hawkins' Deferred Prosecution Agreement at 2, ECF No. 178; *see also* Min. Entry (Oct. 28, 2019).  The three defendants party to this appeal, however, did not enter such an agreement.  Instead, they plead guilty to the offense and were sentenced that same day to time served and each fined $100.  Judgment as to Shailly Barnes, ECF No. 195; Judgment as to Rosalyn Woodward Pelles, ECF No. 197; Judgment as to Elizabeth Theoharis, ECF No. 199.

Those three defendants timely filed their appeal with this Court and proposed a briefing schedule.  Joint Proposed Briefing Schedule, ECF No. 201.  With briefing complete, their appeal is now ripe for review.

## II.   LEGAL STANDARD

Federal Rule of Criminal Procedure 58 "appl[ies] in petty offense and other misdemeanor cases and on appeal to a district judge in a case tried by a magistrate judge."  FED. R. CRIM. P. 58(a)(1).[1]  Subsection (g) of the rule provides that "[a] defendant may appeal a magistrate judge's judgment of conviction or sentence to a district judge within 14 days of its entry."  FED. R. CRIM.

---

[1] The parties do not dispute that, as a criminal statute that exposes defendants to "not more than 60" days' imprisonment, 40 U.S.C. § 6317, 40 U.S.C. § 6135 is a "Class B misdemeanor," 18 U.S.C. § 3559(a)(7), and thus the judgments of conviction and sentences in this matter were properly entered by a magistrate judge of this court, 18 U.S.C. § 3401 ("When specially designated to exercise such jurisdiction by the district court or courts he serves, any United States magistrate judge shall have jurisdiction to try persons accused of, and sentence persons convicted of, misdemeanors committed within that judicial district."); LCrR 58(a) (granting the magistrate judges of this district the power to "conduct trials . . ., accept pleas, impose sentence, and otherwise exercise jurisdiction in cases of misdemeanor offenses in accordance with 18 U.S.C. § 3401 and Rule 58, Federal Rules of Criminal Procedure").

4

P. 58(g)(2)(B). That right to appeal does not entitle a defendant "to a trial de novo by a district judge," but rather, "[t]he scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." FED. R. CRIM. P. 58(g)(2)(D). To the extent a motion to dismiss the charging instrument requires the trial court to make factual findings, those findings are reviewed for clear error. *See, e.g.*, *United States v. Meadows*, 867 F.3d 1305, 1312 (D.C. Cir. 2017). When a motion to dismiss an information raises "only 'pure questions of law,'" however, appellate review is *de novo*. *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Hodge v. Talkin*, 799 F.3d 1145, 1171 (D.C. Cir. 2015)).[2]

Under Federal Rule of Criminal Procedure 12(b)(1), a party may "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Indeed, objections that an information "fail[s] to state an offense," Fed. R. Crim. P. 12(b)(3)(B)(v), "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits," Fed. R. Crim. P. 12(b)(3). "The defense of failure of an indictment to charge an offense includes the claim that the statute apparently creating the offense is unconstitutional." *United States v. Eshetu*, 863 F.3d 946, 952 (D.C. Cir. 2017), *vacated on other grounds* 898 F.3d 36 (D.C. Cir. 2018) (quoting *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973)). In ruling on a pretrial motion to dismiss the trial court must presume the truth of the facts alleged in the charging instrument, *United States v. Park*, 938 F.3d 354, 358 (D.C. Cir. 2019), and may accept

---

[2] Defendants suggest that the judgments entered in this case "are subject to the full supervisory authority and control of the district court," but they misapprehend the support they cite or rely on inapposite caselaw. Defs.' Br. at 4 (citing *United States v. Choi*, 818 F. Supp. 2d 79, 85 (D.D.C. 2011) ("In a federal misdemeanor case, unlike in other settings, a district court judge does not refer the matter to a magistrate, and *does not* exercise blanket supervisory powers." (emphasis added)), then citing *United States v. Beler*, Crim. Cas. No. 19-mj-100 (BAH), 2019 WL 5789747, at *3 (D.D.C. Nov. 6, 2019) (considering a magistrate judge's order dismissing a felony criminal complaint), and then citing *United States v. Wheeler*, 746 F. Supp. 2d 159, 161 (D.D.C. 2010) (same)). When, in a misdemeanor case like this one, a magistrate judge enters a "judgment of conviction or sentence," Federal Rule of Criminal Procedure 58(g) controls the appellate procedure and standard of review.

any "undisputed facts" proffered by the government, *United States v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005) (explaining that "undisputed facts obviate[] the need for [a] district court to make factual determinations properly reserved for a jury").

## III.   DISCUSSION

Defendant-appellants raise a number of arguments in support of their contention that "40 U.S.C. § 6135 . . . violates the First Amendment as applied to criminalizing [their] expressive conduct on the Supreme Court Plaza." Defs.' Br. at 1. They first assert that the grounds of the Supreme Court, including the plaza on which they were arrested, are a public forum. *Id*. at 5. As such, according to defendants any restriction of protected speech there must withstand "strict scrutiny," a test they contend Section 6135 fails. *Id*. at 9. Even if the Supreme Court plaza were a nonpublic forum and restrictions on expressive conduct there were thus subject to a more forgiving standard, Section 6135 would, in their view, still violate the Constitution. *Id*. at 15. Each of these arguments, however, has been rejected by the Supreme Court and the D.C. Circuit. Defendants' valiant attempts to skirt that binding precedent are unavailing.

### A.   The Supreme Court Plaza Is a Nonpublic Forum

The First Amendment provides that "Congress shall make no law . . . abridging the freedom speech." U.S. CONST. amend. I. Despite that unqualified text, "[t]he protections afforded by the First Amendment . . . are not absolute." *Virginia v. Black*, 538 U.S. 343, 358 (2003). The propriety of any given government restriction on expressive conduct depends, in part, on the forum to which that restriction applies. The government's ability to abridge speech in "public forums," like "streets, sidewalks, and parks," is "very limited." *United States v. Grace*, 461 U.S. 171, 177 (1983). Other government property is more amenable to the regulation of expressive conduct. Indeed, "in some circumstances the Government may ban the entry" into

6

such nonpublic forums "of all persons except those who have legitimate business on the premises." *Id*. at 178.

Determining whether a particular forum is public or nonpublic involves careful analysis of whether that place has been "deemed dedicated to the exercise of expressive activity by the public," either "as a matter of tradition" or "by specific designation." *Hodge*, 799 F.3d at 1157 (D.C. Cir. 2015) (first citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) and then citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)).  With respect to the Supreme Court plaza, that analysis has already been performed and binds this Court.  In *Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015), the D.C. Circuit confronted a constitutional challenge to the very statute under which defendants were convicted.  *Id*. at 1149–50.  The plaintiff in *Hodge* sought to "picket, hand out leaflets, sing, chant, and make speeches" on the Supreme Court plaza "either by himself or with a group of like-minded individuals" in order to express how, according to him, "decisions of the Supreme Court have allowed police misconduct and discrimination against racial minorities to continue."  *Id*. at 1154 (internal quotation marks omitted).  The Circuit took as its guide the Supreme Court's decision in *Grace*, where the Supreme Court determined that Section 6135's nearly-identical predecessor could not constitutionally be applied to the sidewalks abutting the Supreme Court's plaza because "[t]here is nothing to indicate to the public that [those] sidewalks are . . . in any way different from other public sidewalks in the city," *Grace*, 461 U.S. at 183, which, "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939).  Following a review of the materials, design and architecture of the plaza, and even the intent of the Supreme Court's architect, the Circuit determined that unlike the Supreme Court's sidewalks, which were

indistinguishable from a traditional public forum, "there is everything to indicate to the public that the plaza is an integral part of [the Supreme Court] grounds." *Hodge*, 799 F.3d at 1159. As "[t]he area surrounding a courthouse traditionally has not been considered a forum for demonstrations and protests," and because there was no indication that Congress had intentionally "dedicate[d] the Supreme Court plaza as a forum for the robust exercise of First Amendment activity by the general public," the D.C. Circuit held that the plaza was "a nonpublic forum." *Id*. at 1159, 1161–62.

Defendants attempt to get around *Hodge*'s determination that the plaza is nonpublic by asserting that the decision "relied on narrow fact patterns and issues, rather than the broader history of the use of the grounds." Defs.' Br. at 7. Moreover, they say, "[t]he decision in *Hodge* was . . . made without the benefit of the factual development and specific application presented" in this case. *Id*. Despite framing their argument as merely distinguishing *Hodge*, defendants tip their hand when they argue that the decision "relied upon an overextension of the Supreme Court's narrow holding in *Grace*." *Id*. In other words, they think the Circuit in *Hodge* got it wrong. Wrong or right, "district judges . . . are obligated to follow controlling circuit precedent until either [the Circuit], sitting en banc, or the Supreme Court, overrule it." *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997).

In any event, defendants' contention that *Hodge*'s reasoning was based on an incomplete picture lacks merit. They note "that a variety of expressive activity has been permitted to occur on the Supreme Court Plaza," pointing to examples including a group that annually prays on the Supreme Court grounds and another group of "five human rights activists, including Manijeh Saba" who displayed a banner on the Supreme Court steps "in protest of all forms of torture." Defs.' Br. at 8–9. They also attach to their brief a photograph of a young Thurgood Marshall

speaking with members of the so-called "Little Rock Nine" on the Supreme Court steps, in an attempt to show there is "historical precedent" for the use of the plaza as a public forum. *Id.* at 9; Defs.' Br., Ex. J, ECF No. 203-11. The Circuit in *Hodge*, however, considered the effect of "the Supreme Court's own enforcement practices" on the plaza's status as a nonpublic forum, and found them "of no moment." *Hodge*, 799 F.3d at 1161–62. "The 'government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.'" *Id.* at 1162 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985)). Defendants have pointed to no such intentional opening of the plaza either before *Hodge* was decided or in the intervening five years.[3] Their invitation to this Court to ignore Circuit precedent on the basis of arguments so recently considered and rejected is thus declined. Until the *en banc* D.C. Circuit or the Supreme Court say otherwise, the Supreme Court plaza is a nonpublic forum.

### B. Section 6135 Is a Reasonable Restriction on Expressive Conduct

As noted above, whether government property is a public or nonpublic forum determines the standard against which any restriction on expressive conduct there must be measured. In traditional public fora, only "[r]easonable time, place, and manner restrictions are allowed," and even then "the restriction must be narrowly tailored to serve a compelling government interest" and cannot discriminate "based on viewpoint." *Summum*, 555 U.S. at 469. In nonpublic forums, like the Supreme Court plaza, however, regulations "must survive only a much more limited review." *Hodge*, 799 F.3d at 1158 (internal quotation marks omitted) (quoting *Int'l Soc'y for*

---

[3] For the two year period between June 11, 2013, when this Court declared the challenged statute, 40 U.S.C. § 6135, "unconstitutional and void under the First Amendment," *Hodge v. Talkin*, 949 F. Supp. 2d 152, 198 (D.D.C. 2013), and the D.C. Circuit's reversal of that decision on August 28, 2015, finding the statute "may be constitutionally enforced in the plaza," in *Hodge*, 799 F.3d at 1150, the plaza provided a forum for free expression, including an example cited by defendant-appellants. *See* Defs.' Br. at 8 ("[F]ollowing the Court's ruling on the Defense of Marriage Act, in June 2013, litigants, their attorneys, and supporters on both sides assembled in front of the Court, including on the Plaza, carrying sign, cameras and chanting.").

*Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992)). "In a nonpublic forum, a 'challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view.'" *Id*. (quoting *Lee*, 505 U.S. at 679). Indeed, the Supreme Court recently explained that its "decisions have long recognized that the government may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885–86 (2018).

Defendants argue that even under the "rubric" applicable to restrictions in nonpublic fora, Section 6135 does not pass "constitutional muster." Defs.' Br. at 15. In particular, defendants argue that the statute "far exceeds the bounds of what is necessary to protect the government's proffered interest . . . and is therefore unreasonable." *Id*. They further contend that "the government has failed to offer any evidence[] that the harms which § 6135 seeks to avoid are real or that the statute's restrictions on constitutionally protected conduct will alleviate those concerns and promote the government's purpose." *Id*.

Again, the D.C. Circuit in *Hodge* unequivocally rejected these same arguments. The government has asserted two interests served by Section 6135: "to protect the decorum and order around the Supreme Court" and "to promote and assure the appearance and actuality of a judiciary uninfluenced by public opinion and pressure." Gov't Br. at 11. The *Hodge* court labeled the former a "substantial" interest, and the latter an "interest of the highest order." *Hodge*, 799 F.3d at 1163–64 (internal quotation marks omitted) (first quoting *Oberwetter v. Hilliard*, 639 F.3d 545, 554 (D.C. Cir. 2011) and then quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 446 (2015)). As to the question whether those interests are actually served by Section 6135, the D.C. Circuit answered in the affirmative. *Id*. at 1165–66 (explaining that, because

"Congress could reasonably conclude that demonstrations and parades in the plaza . . . would compromise the sense of dignity and decorum befitting the entryway to the nation's highest court," their restriction was reasonable, and further concluding Section 6135 was a reasonable effort to prevent conduct that could "foster an impression of a Court subject to outside influence"). Finally, the D.C. Circuit has also already addressed the allegation that Section 6135 has "the capacity to sweep in a range of expressive activity bearing an inadequate connection to the government's interests." *Id*. at 1166. Although individual cases may "implicate the government's interests to a greater extent than others," the Circuit explained that Congress "was under no obligation to fashion § 6135's reach so as to encompass only those forms of expressive activity in the Supreme Court plaza that most acutely implicate the government's concerns." *Id*. at 1167. "Congress," the court said, "could paint with a broader brush." *Id*.

Perhaps in recognition of the roadblock *Hodge* creates for their arguments on this score, defendants change tack in their reply. Turning away from the fit between the government's proffered interests and Section 6135's restrictions, defendants instead assert the law "is not viewpoint neutral and, thus, violates the Constitution." Defs.' Reply Mem. Supp. Defs.' Br. ("Defs.' Reply Br.") at 2, ECF No. 206. Although restrictions on expressive conduct in nonpublic forums undisputedly may not be based on a "disagreement with" a particular "speaker's view," *Lee*, 505 U.S. at 679, it must first be noted that *Hodge* already held that, as a general matter, Section 6135 "is a reasonable, *viewpoint-neutral*—and thus permissible—means of vindicating the government's important interests in the Supreme Court plaza," *Hodge*, 799 F.3d at 1170 (emphasis added). Indeed, "[d]emonstrations supporting the [Supreme] Court's decisions and demonstrations opposing them are equally forbidden in the plaza." *Id*. at 1162.

11

Nevertheless, defendants argue that "post *Hodge* application" of the statute belies any purported viewpoint-neutrality. Defs.' Reply Br. at 2. In particular, defendants point out that during "demonstrations relating to the appointment of Justice Kavanaugh" a group of protestors "moved onto the plaza of the Supreme Court, and ascended the stairs" where they "banged on the door" of the courthouse. *Id*. at 5–6. According to defendants, "[w]hile some demonstrators were reportedly detained, there is no evidence, nor does the government argue that, any protestors were prosecuted." *Id*. at 6. More akin to a claim that defendants are the victims of impermissible selective prosecution, defendants' problem is with law enforcement, not the law. Viewpoint-discriminatory enforcement practices do not transform otherwise viewpoint-neutral laws. Were a police officer to pull over only speeding motorists whose bumpers sported the campaign slogans of a politician he despised while letting other speeders zip by unbothered, his actions would not render the speed-limit viewpoint-discriminatory, though they may give rise to a claim for selective prosecution.[4] In any event, even assuming the viewpoint neutrality of the law could be called into question by the practices of law enforcement, defendants do not clarify how the storming of the plaza by another group of protestors is any evidence of viewpoint discrimination. In defendants' own telling and according to the news article they cited in their motion to dismiss, those protestors were not allowed to remain on the plaza and several were admittedly detained by law enforcement. *Id*. at 6; Defs.' Mot. to Dismiss at 8 (citing Ralph Ellis, *Anti-Kavanaugh Protesters Keep Up the Fight, Even After He's Confirmed*, CNN (Oct. 6, 2018, 11:26 PM), https://www.cnn.com/2018/10/06/politics/kavanaugh-protests/index.html ("Police cleared the steps of the court [at] about 6:15 p.m. and set up barriers.")). The law thus appears to

---

[4] Notably, one of defendants' fellow demonstrators, not a party to this appeal, sought dismissal of the charge against him arguing that he had been "selective[ly] prosecut[ed]" on the basis of "the content of his speech" in the proceedings before the Magistrate Judge. Hawkins' Mot. to Dismiss at 2–3. Defendant-appellants chose not join that motion and raise no claim of selective prosecution here.

have been enforced, even if defendants could not dig up any evidence that those protestors had been prosecuted.[5] Law enforcement are permitted to "exercise enforcement authority" with some degree of discretion based on "unique circumstances." *Hodge*, 799 F.3d at 1162. Pointing to a handful of instances of allegedly inconsistent enforcement is not enough to justify declaring the statute unconstitutional as applied to conduct the parties do not dispute falls under its purview.[6]

---

[5]     The same goes for defendants extended discussion of the trial of Manijeh Saba. Defs.' Reply Br. at 3–5. Saba was apparently arrested for standing on the Supreme Court steps holding a sign that read "We Target, We Torture, We Terrify: Who Are We?" *Id*. at 4. She was charged with violating Section 6135. *Id*. Following a bench trial, she was acquitted by a Magistrate Judge on this Court. *See* Judgment of Acquittal ("Saba Acquittal"), *United States v. Saba*, Crim. Case No. 19-mj-7-DAR-2 (D.D.C. Mar. 27, 2019). Defendants' reliance on the arrest and prosecution of another individual who took part in a demonstration on a subject completely different from the subject of defendants' demonstration is puzzling evidence that the defendants' viewpoint was impermissibly targeted. This example shows just the opposite—demonstrations on topics ranging from the alleged "torture of inmates at Guantanamo Bay," Defs.' Reply Br. at 4, to "persistent poverty in the United States," Defs.' Br. at 1, are treated as equally impermissible on the Supreme Court plaza. Although defendants say the fact of the *Saba* defendant's acquittal "highlight[s] the inconsistency" of the statute's application, they merely speculate as to the reason for the acquittal based on a report published on a website called "Witness Against Torture," Defs.' Br., Ex. L at 1, ECF No. 203-13. The Magistrate Judge gave no reason. Saba Acquittal at 1 (stating simply "The Defendant was found not guilty"). Absent more, that acquittal provides no basis for believing that a facially viewpoint-neutral statute is anything but.

[6]     Defendants also make the somewhat bewildering argument that Section 6135 is not viewpoint-neutral because it regulates only "speech which 'bring[s] into public notice a party, organization or movement.'" Defs.' Reply Br. at 2 (alteration in original) (emphasis omitted). They explain that this "requirement that the content of the message be examined to determine its legality evidences [the statute's] lack of viewpoint neutrality." *Id*. at 3. This argument suffers from at least two flaws. First, the reference to "party, organization or movement" appears in only one of the two statute's clauses. *Hodge*, 799 F.3d at 1162 ("The Assemblages Clause makes it unlawful 'to parade, stand, or move in processions or assemblages,' and the Display Clause makes it unlawful to 'display' a 'flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement.'" (quoting 40 U.S.C. § 6135)). Defendants' demonstration on the plaza is a closer fit with the so-called "Assemblages Clause" than the "Display Clause," as, apart from clothing identifying them as members of the Poor People's Campaign, defendants did not display anything, but instead stood in prayer and made speeches through a megaphone to the assembled crowd. In any event, that a restriction requires examination of an expression's *content* does not mean that it calls for discrimination based on any particular *viewpoint*. *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 369 (D.C. Cir. 2018) (declining to "erase the distinction between content-based and viewpoint-based restrictions"). The distinction matters—in nonpublic forums content-based restrictions are permitted as long as they are reasonable while viewpoint-based restrictions are wholly impermissible. *See Mansky*, 138 S. Ct. at 1885 ("[T]he government may impose some content-based restrictions on speech in nonpublic forums."). To the extent that defendants argue Section 6135 may not be constitutionally applied to their conduct because it "is inextricably intertwined with the content of the expression," the argument fails. Defs.' Reply Br. at 7.

### C. Section 6135 Is Neither Unconstitutionally Overbroad Nor Vague

In their opening brief, defendants make several arguments in support of their contention that Section 6135 can only survive if it is "narrowly tailored to serve a compelling interest." Defs.' Br. at 9. As detailed above, as a restriction in a nonpublic forum, the test Section 6135 must pass is far more forgiving. Nevertheless, in the course of that discussion, defendants appear to raise two arguments that could, on their own, render their prosecution unconstitutional: namely that "as applied here" Section 6135 "is unconstitutionally vague and overly broad." *Id.* at 10.

With respect to the overbreadth concern, that doctrine is typically leveraged by individual speakers whose conduct is constitutionally proscribed by a regulation to forestall prosecution under or enforcement of that law by raising the interests of nonparties whose speech may be chilled by the law's illegitimate sweep. *Hodge*, 799 F.3d at 1170–71. Defendants, however, like the plaintiff in *Hodge*, never "argue[] that § 6135 may be constitutionally applied to [their] own conduct but is unconstitutional in its application to the protected speech of others." *Id.* at 1171. They instead "contend[] that § 6135 cannot be applied to anyone (including [themselves]) in the Supreme Court plaza, because the law curtails too much speech in light of the government's underlying interests." *Hodge*, 799 F.3d at 1171. Defendants' particular brand of overbreadth claim thus lies outside the typical scope of that doctrine. Moreover, their argument was already rebuffed when the D.C. Circuit in *Hodge* determined that the "means-ends fit" of Section 6135 "is reasonable." *Id.* There is thus "no viable avenue for concluding nonetheless that § 6135 has too many unconstitutional applications to survive." *Id.*

As for defendants' claim that the text and application of Section 6135 leaves the public "without the necessary guidance to determine what conduct is or is not allowed and where," *Hodge* again says otherwise. Defs.' Br. at 11. The vagueness doctrine is "an outgrowth not of

14

the First Amendment, but of the Due Process Clause of the Fifth Amendment." *United States v. Williams*, 553 U.S. 285, 304 (2008).[7] The doctrine "prohibits the Government from taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Beckles v. United States*, 137 S. Ct. 886, 892 (2017) (internal quotation marks omitted) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). Defendants do not clarify what terms in the statute are vague and fail to provide notice or are otherwise "standardless."[8] Instead, they attempt to reverse engineer a vagueness problem by again pointing to a handful of events that have taken place on the Supreme Court plaza that they say are evidence of the statute's inconsistent enforcement. Inconsistent application of a statute does not render its text incomprehensible, as even a law composed with perfect clarity can be inconsistently enforced. While vague laws may allow for or encourage "seriously discriminatory enforcement," *Williams*, 553 US. at 304, the equation does not necessarily work the other way around. In any event, to the extent defendants allege the text of Section 6135 is ambiguous,

---

[7] Typically, the vagueness doctrine cannot be leveraged by individuals whose "conduct . . . is clearly proscribed" on the theory that the law is vague "as applied to the conduct of others." *Williams*, 553 U.S. at 304 (internal quotation marks omitted) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95 (1982)). This makes defendants' argument somewhat difficult to pin down, as they nowhere say explicitly whether they believe their conduct is or is not covered by the statute. They do not dispute, however, that they "broke away from a larger group on the street and walked onto the plaza with the intent to draw attention to their conduct . . ., their cause was indicated by various items of clothing worn, or carried . . . other protestors remained on the sidewalk . . . they were followed by cameras and recording devices . . . they used a megaphone . . . [and] tourists waited while they demonstrated." Defs.' Reply Br. at 4. This describes exactly the kind of "expressive assemblage[]" to which *Hodge* determined Section 6135 may constitutionally be applied. *Hodge*, 799 F.3d at 1168. In *Williams*, however, the Supreme Court explained that the requirement that the law be vague with respect to a litigant's conduct is "relaxed" in the First Amendment context. *Williams*, 553 U.S. at 304. In light of the conclusion, *infra*, that Section 6135 contains no unconstitutional indeterminacy, however, the Court will consider defendants' vagueness challenge on its merits.

[8] Defendants do say in passing that Section 6135's "prohibition on displays 'designed . . . to bring into public notice a party, organization, or movement' is vague in light of its failure to further define those terms." Defs.' Br. at 10 (alteration in original). *Hodge*, however, already held that any "alleged ambiguity" in that phrase was "resolved in *Grace*" wherein "[t]he Supreme Court held that almost any sign or leaflet carrying a communication . . . would be designed or adapted to bring into public notice [a] party, organization , or movement." *Hodge*, 799 F.3d at 1173 (internal quotation marks omitted) (third alteration in original) (quoting *Grace*, 461 U.S. at 176).

15

*Hodge* resolves that ambiguity. *Hodge*, 799 F.3d at 1168 (explaining that the first clause of the statute is aimed at "joint conduct that is expressive in nature and aimed to draw attention"); *id*. at 1173 (holding that the statute's second clause "does not 'fail[] to provide a person of ordinary intelligence fair notice of what is prohibited'" (alteration in original) (quoting *Williams*, 553 U.S. at 304)). Defendants present no reason to avoid this binding precedent upholding Section 6135 as not unconstitutionally vague.

## IV.     CONCLUSION

Defendants try mightily to distinguish the D.C. Circuit's decision in *Hodge*. Likewise, they point to certain post-*Hodge* events in an attempt to show how, despite the cases' legal and factual similarity, the result should be different this time. Unfortunately for them, the only post-*Hodge* event that could lead to a different result—its overruling—has yet to occur. Accordingly, the defendants' convictions are affirmed.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: August 24, 2020

_____
BERYL A. HOWELL
Chief Judge